# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Kimberly S.,

        Plaintiff,

v.

Nancy A. Berryhill, Acting Commissioner
of Social Security,

        Defendant.

Case No. 18-cv-311 (TNL)

**ORDER**

Karl E. Osterhout, Osterhout Disability Law, LLC, 521 Cedar Way, Suite 200, Oakmont, PA 15139 & Edward C. Olson, Disability Attorneys of Minnesota, 331 Second Avenue South, Suite 420, Minneapolis MN 55401 (for Plaintiff); and

Kizuwanda Curtis, Special Assistant United States Attorney, Social Security Administration, 1301 Young Street, Suite A702, Dallas, TX 75202 (for Defendant).

## I.  INTRODUCTION

Plaintiff Kimberly S. challenges Defendant Commissioner of Social Security's denial of her application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381.[1] The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c) and D. Minn. LR 7.2. This matter is before the Court on the parties' cross motions for summary judgment. For the reasons set forth below, the Court denies Plaintiff's motion and grants Defendant's motion.

---

[1] Plaintiff previously sought disability insurance benefits as well but has not appealed the Administrative Law Judge's decision to deny her those benefits.

## II. BACKGROUND

### A. Procedural History

Plaintiff filed an action for SSI on October 27, 2014, alleging a disability onset date of January 1, 2007. Plaintiff alleges impairments of major depressive disorder/adjustment disorder, anxiety disorder, post-traumatic stress disorder, personality disorder, a history of breast cancer, status post-mastectomy, multilevel degenerative changes in the spine, degenerative joint disease, and obesity. Plaintiff was found not disabled on February 3, 2015. That finding was affirmed upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge. A hearing was held on January 20, 2017 and, on March 1, 2017, the ALJ issued a decision denying Plaintiff's claim for benefits. Plaintiff sought review of the ALJ's decision through the Appeals Council, which denied her request for review. Plaintiff now seeks review by this Court.

### B. Administrative Hearing and ALJ Decision

The ALJ found that Plaintiff had the severe impairments of major depressive disorder/adjustment disorder, anxiety disorder, post-traumatic stress disorder, personality disorder, a history of breast cancer, status post-mastectomy, multilevel degenerative changes in the spine, degenerative joint disease, and obesity. (Tr. 13). The ALJ further found and concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Pt. 404.15, Subpt. P, App. 1. (Tr. 13-14). The ALJ considered Listings 1.00Q (musculoskeletal impairment), 1.02 (major dysfunction of a joint), 1.04 (disorders of the spine), 3.00I (respiratory disorder), 4.00F (cardiovascular disorder), 12.04 (depressive,

bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.08 (personality and impulse-control disorders), 12.15 (trauma- and stressor-related disorders), and 13.10 (breast cancer). Following this, the ALJ found Plaintiff to have the residual functioning capacity ("RFC") to"

> perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except no climbing of ladders, ropes, or scaffolds, occasional climbing of ramps and stairs, occasional stooping and crouching, no kneeling or crawling, no tasks that would specifically require the act of balancing for completion such as walking along a narrow plank or something of that nature where the task would actually require balancing for completion, no work at unprotected heights or with hazards or hazardous machinery, occasional overhead reaching bilaterally, routine, repetitive 3-4 step tasks and instructions which are fixed and predictable from day to day and would align with a specific vocational preparation (SVP) of a one or two as defined in the *Dictionary of Occupational Titles* (DOT), occasional brief and superficial interaction with coworkers and the public, and specifically these tasks would not require collaboration or teamwork with coworkers and would not require direct interaction with the public for completion, and with respect to interaction with supervisors, the fifth digit of the DOT code representing the people code would be no less than an 8, as well as no strict production rate pace involved in the performance of these tasks, such as on an assembly line.

(Tr. 16-17). The ALJ then concluded Plaintiff had no past relevant work, but that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform. (Tr. 26). In particular, the ALJ determined that Plaintiff could work in visual inspection, as an assembler (plastics), and as a bakery worker. (Tr. 27). Accordingly, the ALJ found that Plaintiff was not disabled since January 1, 2007. (Tr. 27).

## III.  ANALYSIS

### A.  Legal Standard

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. §§ 423(a)(1)(E), 1381a; *accord* 20 C.F.R. §§ 404.315, 416.901. An individual is considered to be disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less" than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do his or her previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account his or her age, education, and work experience. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also* 20 C.F.R. § 404.1505(a). Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The ALJ must consider whether:

> (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)). In general, the burden of proving the existence of disability lies with the claimant. *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991); 20 C.F.R. § 404.1512(a);

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011) (citing *Harris v. Barnhart*, 356 F.3d 926, 928 (8th Cir. 2004)). "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." *Boettcher*, 652 F.3d at 863 (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). This standard requires the Court to "consider the evidence that both supports and detracts from the ALJ's decision." *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012) (citing *Ellis v. Barnhart*, 393 F.3d 988, 993 (8th Cir. 2005)).

The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Perks*, 687 F.3d at 1091 (citing *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006)). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, the court must affirm the [ALJ's] decision." *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. *Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). Likewise, courts "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Pelkey*, 433 F.3d at 578 (quotation omitted).

## B. The ALJ's Consideration of Plaintiff's Age

Plaintiff first contends that the ALJ failed to consider the fact that Plaintiff was slightly more than six months away from her 55th birthday when the ALJ rendered her decision. Plaintiff further argues that had the ALJ considered Plaintiff's "borderline age," the ALJ would have determined that Plaintiff was disabled. Defendant argues that the ALJ's decision is appropriate because the ALJ needed to consider Plaintiff's borderline age only if she was less than six months away from turning 55.

The medical-vocational guidelines ("grids") "are a set of charts listing certain vocational profiles that warrant a finding of disability or non-disability." *McCoy v. Astrue,* 648 F.3d 605, 613 (8th Cir. 2011) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2). "The grids come into play at step five of the analysis, where 'the burden shifts to the Commissioner . . . '" to prove that the claimant has the capacity to perform a significant number of other jobs in the national economy that are consistent with her impairments and vocational factors. *Phillips v. Astrue*, 671 F.3d 699, 702 (8th Cir. 2012) (quoting *Holley v. Massanari,* 253 F.3d 1088, 1093 (8th Cir. 2001)). "If the ALJ's findings as to RFC, age, education, and work experience fit any of the combinations of those criteria contained in the Tables in Appendix 2 to Part 404, then the ALJ must reach the conclusion (either 'disabled' or 'not disabled') directed by the relevant Rule or line of the applicable Table." *Id.* (internal quotation marks omitted) (quoting *Reed v. Sullivan,* 988 F.2d 812, 816 (8th Cir. 1993)).

The grids specify three types of age categories: a younger person (under age 50), a person closely approaching advanced age (between ages 50 and 54), and a person of

advanced age (age 55 or older). 20 C.F.R. § 416.963(c)-(e). Age categories are not, however, applied mechanically in a borderline situation. *Phillips*, 671 F.3d at 702. Instead, if the claimant is "within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that [the claimant is disabled], [the commissioner] will consider whether to use the older age category after evaluating the overall impact of all the factors of [the claimant's] case." 20 C.F.R. § 416.963(b).

There is no "bright line" rule as to what constitutes a borderline age situation. *Phillips*, 671 F.3d at 703. But the "predominant view" is that six months from the next age category is the absolute outer limit. *Bennett v. Comm'r of Soc. Sec.*, 17-cv-582, 2019 WL 410271 *4 (M.D. Fl. Feb. 1, 2019); *see also Lasorda v. Comm'r of Soc. Sec.*, 16-cv-435, 2017 WL 1276760 *6 (W.D. Mich. Apr. 6, 2017) (noting six months is more than a few months). That view is consistent with the Social Security Administration's Program Operations Manual, which construes the language "within a few days to a few months" to "mean a period not to exceed six months." POMS DI 25015.006. The Court must "defer to the agency's interpretations stated in the POMS unless they are 'arbitrary, capricious, or contrary to law.'" *Lee v. Colvin*, 631 F. App'x 538, 541 n.1 (10th Cir. 2015) (quoting *McNamar v. Apfel*, 172 F.3d 764, 766 (10th Cir. 1999)); *see also Draper v. Colvin*, 779 F.3d 556, 560-61 (8th Cir. 2015) (recognizing Social Security Act as among the most intricate pieces of legislation ever drafted by Congress and giving substantial deference to other POMS provisions). Neither party argues that the relevant POMS here is arbitrary or capricious.

Here, Plaintiff was 54 on March 1, 2017, the day the ALJ issued her decision, and turned 55 on September 6, 2017, six months and five days later. Because Plaintiff's age was outside the limit of what constitutes borderline, the ALJ was not required to address this issue in her decision. The Court therefore concludes the ALJ's decision was not erroneous.

Plaintiff contends that other courts have determined that a person's borderline age should be considered when the person is six months and only a few days away from changing age categories, citing to the example of *Ford v. Berryhill*, 16-cv-140, 2017 WL 3968742 *11 (E.D. Mo. Sept. 8, 2017). The Court does not find that case persuasive. There, the district judge remanded a case back to the ALJ for reconsideration on a number of issues regarding conflicting testimony between certain witnesses. *Id*. In doing so, the court noted that the claimant argued that the Commissioner erred by failing to consider whether the claimant should have been classified in the older age category. *Id*. The court declined, however, to address this issue, stating only that it would permit the ALJ to consider it on remand if necessary. *Id*. The court conducted no legal analysis on this issue, nor held that the ALJ erred by failing to consider this issue. *Id*. In fact, the Court stated expressly that it was remanding on other grounds. *Id*. Thus, *Ford* provides no support for Plaintiff's position that the ALJ erred in failing to consider whether her age was borderline to a different age category.

Plaintiff further argues that the ALJ was required to make at least some finding showing that she considered Plaintiff's age and whether it was appropriate to apply the higher age category. It is true that the ALJ did not consider whether Plaintiff was of a

borderline age, or whether it was appropriate to apply the advanced age category. But the ALJ's failure to do so does not mean that her decision was erroneous. When the facts indicated that no borderline age situation exists, remand is not necessary, even if the ALJ fails to make express findings regarding the claimant's age. *Pittard v. Berryhill*, 17-cv-71, 2018 WL 4219193 *4 (E.D. Va. Sept. 5, 2018); *see also Davis v. Berryhill*, No. 17-cv-521, 2018 WL 1536557 *9 (S.D. Tex. Jan. 3, 2018) (noting that because Plaintiff would not turn 50 for more than six months, ALJ had no duty to consider whether the older age category should apply); *Stoecklein v. Colvin*, No. 13-cv-1656, 2015 WL 1000723 *1 n.1 (W.D. Penn. Mar. 5, 2015) (stating that ALJ did not err in failing to acknowledge borderline age argument where claimant was more than six months outside that category). In this case, because Plaintiff was more than six months outside the next age category and because six months is the outer limit that a majority of courts have adopted regarding a borderline age analysis, the ALJ was not required to conduct such an analysis here. Accordingly, the Court concludes that the ALJ's decision was not erroneous.

In reaching this decision, the Court recognizes that the Eighth Circuit Court of Appeals has previously concluded that an ALJ is required to make some findings regarding the claimant's borderline age. *See Phillips*, 671 F.3d at 705-06. But the *Phillips* court reached its decision in a case where the claimant was only four months from her 55th birthday. *Id*. at 703-04. And each of the cases that the *Phillips* court relied on to reach its decision were cases where the claimant was less than six months from his or her next birthday. *See Lucas v. Barnhart*, 184 F. App'x 204, 208 (3d Cir. 2006) (remanding where claimant was just over three months from birthday); *Cox v. Apfel*, 166 F.3d 346 (Table)

(noting plaintiff was "within six months of the next age category"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 527 (6th Cir. 2006) (noting claimant was only 55 days away from 55th birthday)). The *Phillips* Court did not hold that ALJs are required to make such findings when the claimant is outside the agency-prescribed standard of six months for borderline age cases. The Court therefore declines to apply the logic of *Phillips* to this case.

### C. Treating Specialist Opinion

Plaintiff next argues that the ALJ erred by rejecting the opinion of her treating physician, Dr. Allison Wert. Under 20 C.F.R. § 404.1527(c) or § 416.927(c), medical opinions from treating sources are weighed using several factors: (1) the examining relationship; (2) the treatment relationship, such as the (i) length of the treatment relationship and frequency of examination and the (ii) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors. If a treating source's medical opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it is given controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Treating sources include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. §§ 404.1502(a), 416.902(a). "A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination." *House v. Astrue*, 500 F.3d 741, 745 (8th

Cir. 2007). An ALJ "may give a treating doctor's opinion limited weight if it provides conclusory statements only." *Samons v. Astrue*, 497 F.3d 813, 818 (8th Cir. 2007) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1494 (8th Cir. 1995)). Additionally, "[a] treating physician's own inconsistency may . . . undermine his opinion and diminish or eliminate the weight given his opinions." *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)).

### 1.     The Administrative Record

At the time of the hearing, Plaintiff had been living with her daughter and three grandchildren for multiple years. (Tr. 39-40). For a short period of time, she worked about two hours a week as a housekeeper for a family friend. (Tr. 40). Before that, Plaintiff's most recent work for pay occurred in 2001 or 2002, when she was a housekeeper at Motel 6. (Tr. 41). Currently, Plaintiff's primary responsibilities are related to care for her grandchildren. (Tr. 53). She feeds them breakfast, dresses them, takes them to the bus stop, cooks dinner for them, and is with them "all the time." (Tr. 53). Plaintiff receives "general assistance" and food stamps, and contributes approximately $200 to the household bills. (Tr. 54). Plaintiff's medical records indicate that her daughter occasionally compensates Plaintiff for babysitting her grandchildren. (Tr. 368, 512). Plaintiff's daughter is responsible for most of the errands in her house. (Tr. 55).[2]

Plaintiff has struggled with post-traumatic stress disorder for several years. (Tr. 47). Certain situations trigger "reactions" from her, causing severe anxiety and panic attacks.

---

[2] At the ALJ hearing, Plaintiff also testified about a number of physical impairments. She does not challenge the ALJ's findings on those issues.

(Tr. 47). Plaintiff testified that she is unable to continue with her normal day following those attacks. (Tr. 48). She further testified that she experiences panic attacks frequently. (Tr. 49). She also testified that she had no motivation, a "very low" energy level, poor concentration and problems sleeping. (Tr. 49-50). As a result, Plaintiff leaves her house only twice a week for errands. (Tr. 49). Plaintiff has considerable anxiety regarding certain medications that she has been prescribed previously, believing that if she takes them, she will have difficulty breathing. (Tr. 51).

Over the past several years, Plaintiff has received treatment from a number of medical providers. Dr. Wert, her primary care physician, has treated Plaintiff for panic disorder, generalized anxiety disorder, recurrent treatment resistant depressive disorder, and post-traumatic stress disorder since 2006. (Tr. 1726). In December 2009, Dr. Wert referred Plaintiff to psychologist Dr. Mary Bradmiller for a diagnostic evaluation. Her treatment notes indicate that Plaintiff has struggled with anxiety since she was 8 or 9 years old and that at certain points, Plaintiff experienced panic episodes so severe that she would call an ambulance. (Tr. 339, 340). Dr. Bradmiller's notes further indicated that Plaintiff had been prescribed a number of medications to help with depression, anxiety, and post-traumatic stress disorder. (Tr. 340). Plaintiff attributed her current symptoms in part to a recent cancer diagnosis. (Tr. 339). At the time of that evaluation, Plaintiff lived alone in Prior Lake and took care of horses. (Tr. 341). She also traveled to Minneapolis every day to take care of her grandchildren, including one who Plaintiff described as "behaviorally out of control." (Tr. 341).

Dr. Bradmiller diagnosed Plaintiff with adjustment disorder, post-traumatic stress disorder, a history of panic disorder, and possible recent panic attacks. (Tr. 342). She described Plaintiff's thought process as logical and goal-orientated, her speech as normal, and her affect as "somewhat restricted." (Tr. 342). Plaintiff returned to Dr. Bradmiller for psychotherapy in March 2010. There, she reported greater anxiety and additional depressive symptoms related to family illnesses and medical procedures. (Tr. 354-55). Plaintiff did not see Dr. Bradmiller again until June 2010. (Tr. 359). There, she reported that she continued to struggle with anxiety and stress following issues with her daughter's boyfriend. (Tr. 359).

It appears that Plaintiff did not see Dr. Bradmiller following the June 2010 appointment until February 2012. (Tr. 366). At the February 2012 appointment, Plaintiff reported that her symptoms were quite similar to what she described at her previous appointment. (Tr. 367). She attributed some of this to her mother's recent passing and her son's legal troubles. (Tr. 367-69). She described herself as "constantly panic struck," overwhelmed, helpless, and hopeless. (Tr. 367). Plaintiff was still caring for her horses at the time of the appointment, though she indicated that she planned to sell at least one. (Tr. 368).

In September 2014, following a visit to her primary care physician, Plaintiff saw Dr. Jan Tyson Roberts for a psychology brief diagnostic intake. (Tr. 1333). Her diagnostic screening indicated severe depressive symptoms, anxiety disorder with severe symptom severity, and post-traumatic stress disorder. (Tr. 1334). Based on those results, Dr. Roberts diagnosed Plaintiff with post-traumatic stress disorder and major depressive disorder. (Tr.

1337). She noted that Plaintiff chose to discontinue therapy in 2012 because she was not ready to discuss certain topics with her therapist. (Tr. 1337). At that visit, Plaintiff identified health and family concerns as her primary "stressors." (Tr. 1339). Dr. Roberts described Plaintiff's speech as normal, her affect as restricted, her thought process as logical and goal oriented and her immediate and short-term memory as intact. (Tr. 1333). Plaintiff again saw Dr. Roberts for a behavioral health appointment in October 2014. (Tr. 1272). Dr. Roberts indicated that Plaintiff reported continued anxiety with occasional panic symptoms. (Tr. 1273).

Plaintiff also was referred to Dr. A. Neil Johnson of Disability Consultants PC for a medical evaluation. (Tr. 1549). Dr. Johnson said little about Plaintiff's mental health, other than to note that though she was "pleasant and cooperative," she appeared somewhat anxious. (Tr. 1552). He further noted that Plaintiff did not wish to discuss the fact that a family member had previously abused her. (Tr. 1552).

In March 2015, Plaintiff was referred for a psychiatric assessment with Karen Leaman, a nurse with the Hennepin County Medical Center. (Tr. 1683). Leaman noted that though Plaintiff took Klonopin at bedtime to assist with her symptoms, she had stopped taking other medications because she believed they exacerbated her symptoms. (Tr. 1683). Plaintiff reported to Leaman that she was depressed, frustrated, and sad "all the time," and that she experienced panic attacks regularly. (Tr. 1683). Leaman diagnosed Plaintiff with post-traumatic stress disorder, noting that her symptoms interfered with her ability to function "more capably." (Tr. 1684). Leaman recommended that Plaintiff try other courses of treatment, but Plaintiff declined. (Tr. 1684). Leaman also saw Plaintiff for a follow-up

visit in May 2016. Plaintiff reported additional anxiety but was reluctant to try new medications. (Tr. 1742). Instead, Plaintiff agreed to follow up with psychotherapy and psychiatric care. (Tr. 1742).

Plaintiff also saw psychologist Dr. Lisa Legrand briefly. Dr. Legrand reported in June 2015 that Plaintiff often stayed in bed 2-3 days a week and that Plaintiff reported a number of health-related issues regarding her and her family that triggered anxiety. (Tr. 1839). Dr. Legrand further noted that Plaintiff's thought process was logical and goal orientated, that her attention and concentration was normal, that her insight and judgment were adequate, and that affect was "tearful and anxious/nervous." (Tr. 1839).

Plaintiff then saw Dr. Laura Van Cleve for a diagnostic assessment in October 2015. (Tr. 1945). Dr. Van Cleve noted that Plaintiff reported "severe panic" since she was 9 years old, related to the illnesses and deaths of her sister and mother, as well as physical and domestic abuse that she suffered. (Tr. 1946, 1949). Plaintiff also stated that her symptoms were exacerbated by an upcoming surgery that she required. (Tr. 1946). Plaintiff further stated that she was worried about her daughter and grandchildren. (Tr. 1947). Plaintiff stated that she was afraid of taking new medication that could exacerbate her symptoms. (Tr. 1947). Dr. Van Cleve diagnosed Plaintiff with post-traumatic stress disorder, panic disorder with agoraphobia, insomnia, and depression. (Tr. 1949-50). Dr. Van Cleve prescribed Plaintiff imipramine. (Tr. 1949).

Following her October 2015 diagnostic assessment, Plaintiff saw therapist Kristin Wiggs, who noted that Plaintiff reported severe panic attacks, insomnia, and depression, which caused her to isolate herself, lie down for most of the day, and not participate in

activities. (Tr. 1989, 2341). Plaintiff told Wiggs that she suffered from childhood trauma, that she previously attempted suicide when she was 17 or 18, and that she wished to learn coping skills in order to go through with an upcoming surgery and to reduce the amount and length of her depressive episodes. (Tr. 2345-46).

At the October 2015 appointment, Wiggs noted that Plaintiff appeared alert and orientated, that her attention and concentration were fair, and insight and judgment were fair. (Tr. 1990). Wiggs made the same observations regarding Plaintiff at follow-up appointments that occurred on November 10, 2015, December 1, 2015, December 30, 2015, January 13, 2016, February 10, 2016, and February 24, 2016. (Tr. 2010, 2034, 2096, 2112-13, 2163, 2178). At her December 30, 2015 visit, Plaintiff began Cognitive Processing Therapy, where she indicated that most of her current symptoms and distress result from past physical abuse that she witnessed between her parents. (Tr. 2355).

Plaintiff reported midway through her treatment that her visits with Wiggs had been helpful. (Tr. 2125). She struggled, however, to complete homework assignments related to treatment and reported at her March 4, 2016 visit that she continued to experience "on-going distress" related to past abuse. (Tr. 2208-09, 2360-62). Wiggs and Plaintiff determined they would no longer attempt Cognitive Processing Therapy but would instead focus on coping skills going forward. (Tr. 2208-09). Plaintiff, however, cancelled or failed to show up at several appointments following her March 2016 appointment, apparently as a result of "current transportation issues and stressors." (Tr. 2295). As a result, Wiggs and Plaintiff decided to terminate treatment, with the recommendation that Plaintiff pursue therapy again when her "psychosocial stressors" decreased. (Tr. 2295). Wiggs indicated

that though Plaintiff was better able to cope with an upcoming surgical procedure, she had made no progress toward "reducing her distress related to past trauma." (Tr. 2294). Plaintiff later reported that therapy had become too "intense." (Tr. 2306).

In September 2016, Plaintiff saw Dr. Wert. Plaintiff reported that her mood was not stable and that she was concerned about the fact that her daughter was marrying a man that Plaintiff did not know and moving to the Dominican Republic with him, along with Plaintiff's grandchildren. (Tr. 2306). Plaintiff indicated that she continued to struggle with insomnia and stated that she was concerned that she would need to find a new job and house after her daughter moved. (Tr. 2306). Plaintiff also asked if she could participate in group therapy. (Tr. 2315). Dr. Wert noted that Plaintiff's mood, affect, and behavior were normal. (Tr. 2308).

Dr. Wert filled out a Social Security General Medical Source Statement in October 2016. (Tr. 1733). There Dr. Wert assessed Plaintiff's prognosis as "fair to poor," noting that she exhibited poor eye contact, excessive fatigue, an inability to get to appointments, fear when in public, and depression related to family behavior and actions. (Tr. 1726). Dr. Wert determined that Plaintiff's symptoms would interfere with her concentration and attention up to 75 percent of the day and indicated that Plaintiff would be "incapable of even low stress jobs." (Tr. 1726-27). As a result of Plaintiff's symptoms, Dr. Wert indicated that Plaintiff would need to miss work at least four days a month. (Tr. 1728). She also noted that Plaintiff had extreme limitations in her ability to perform activities of daily living, maintain social functioning, and maintain concentration, persistence, or pace. (Tr. 1730). She further indicated that Plaintiff had "no useful ability" to understand, remember or carry

out detailed or complex job instructions, deal with co-workers, supervisors, and the public in an employment setting, tolerate normal routine supervision associated with competitive work, deal with changes in a routine work setting, maintain concentration and attention for two-hour segments, complete a normal work day or workweek, work near others without being distracted by them, perform activities within a schedule, be punctual, and adhere to basic work-place standards. (Tr. 1731-32). Finally, Dr. Wert noted that Plaintiff's ability to understand, remember, and carry out simple job instructions, make basic decisions and exercise proper judgment in a work setting, sustain an ordinary routine without special supervision, and maintain socially appropriate behavior was, at most, satisfactory only "some of the time." (Tr. 1731-32).

In evaluating Plaintiff's initial disability insurance benefits claim, state consultant Dr. S. Hill assessed Plaintiff's anxiety disorders and affective disorders as severe. (Tr. 86). In looking at the "B" Criteria of the listings, Dr. Hill determined that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace, mild restriction of activities of daily living, mild difficulties in maintaining social function, and no repeated episodes of decompensation. (Tr. 87). In assessing Plaintiff's RFC, Dr. Hill indicated that Plaintiff had no significant limitations in her ability to remember work-like procedures and locations, understand and remember very short and simple instructions, maintain attention and concentration for extended periods, perform activities in a schedule, maintain regular attendance, and be punctual, sustain a ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, make simple work-related decisions, and to complete a normal workday and workweek without

interruption. (Tr. 92-93). Dr. Hill also indicated that Plaintiff had limitations in her memory, understanding, and ability to sustain concentration and that her ability to carry out detailed instructions was moderately limited. (Tr. 92).

In evaluating Plaintiff's disability claim on reconsideration, state consultant Dr. James Alsdurf also assessed Plaintiff's anxiety disorders and affective disorders as severe. (Tr. 105). Dr. Alsdurf further concluded, regarding the "B" criteria of the Listings, that Plaintiff had mild restrictions in her activities of daily living, that she had mild difficulties in maintaining social functioning, that she had moderate difficulties in maintaining concentration, persistence, or pace, and that she had no repeated episodes of decompensation. (Tr. 106). Dr. Alsdurf generally affirmed Dr. Hill's RFC assessment of Plaintiff. (Tr. 112-14).

The ALJ evaluated the opinions of Dr. Wert and the two state consultants before rendering her decision. Regarding Dr. Wert, the ALJ focused primarily on her October 2016 Medical Source Statement. (Tr. 24-25). The ALJ gave that statement little weight, finding that it was inconsistent with her own examinations and treatment notes, Plaintiff's mental status exams, and the responsibility that Plaintiff displayed in caring for her grandchildren. (Tr. 24-25). The ALJ further noted that Dr. Wert's opinion was more closely aligned with Plaintiff's self-reported limitations. (Tr. 24).

In contrast, the ALJ placed substantial weight on the opinions of the state consultants. (Tr. 25). The ALJ explained that these opinions were consistent with her overall functioning, course of treatment, medications, examinations, and observations by providers. (Tr. 25). The ALJ further stated that the Plaintiff's overall functioning supported

her RFC finding. (Tr. 25-26). In particular, the ALJ noted that Plaintiff was independent, required no reminders for personal chores, maintained a driver's license, shopped, and made purchases. (Tr. 25-26).

The Court therefore turns to the factors found in 20 C.F.R. §§ 404.1527(c), 416.927(c). Plaintiff contends that the ALJ did not properly consider Dr. Wert as a treating source worthy of more weight than other physicians. She further contends that the ALJ erred in finding Dr. Wert's opinion to be inconsistent with the totality of the evidence, in rejecting that opinion for relying too much on Plaintiff's subjective reports, and by assigning substantial weight to the state consultants. The Court will consider each argument in turn.

### 2. Treating Relationship

The ALJ did not disregard the nature of the relationship between Dr. Wert and Plaintiff entirely. The ALJ noted expressly in her analysis that Dr. Wert offered a "treating source opinion." (Tr. 24). The ALJ also noted that Plaintiff had seen Dr. Wert as far back as 2014, though the ALJ did not discuss contacts with Dr. Wert prior to that date. (Tr. 21). Thus, implicit in the ALJ's analysis was the fact that Wert was Plaintiff's treating provider and that Wert had been so for a lengthy period of time. The Court therefore finds no merit in Plaintiff's contention that the ALJ failed to assign the appropriate weight to Dr. Wert's opinion.

### 3. Subjective Complaints

Plaintiff further contends that the ALJ erred in rejecting Dr. Wert's opinion for relying too much on Plaintiff's self-reported symptoms. But an ALJ is permitted to give

less weight to those opinions "based largely" on the claimant's speculative complaints. *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007). In this case, the limitations that Dr. Wert identified were consistent with the symptoms and concerns that Plaintiff reported, but, as will be discussed in greater detail below, inconsistent with Dr. Wert's observations in her treatment notes, including her observation that Plaintiff's mood, affect, and behavior were normal. Thus, the ALJ was well within her discretion to determine that Dr. Wert's opinion was based primarily on Plaintiff's subjective complaints. The ALJ's finding on this issue is supported by substantial evidence.

### 4. Supportability and Consistency

The Court now turns to the supportability and consistency of the opinions. The ALJ placed less weight on Dr. Wert's opinion because it was inconsistent both with her own internal notes and with other evidence in the record. The ALJ also placed greater weight on the state consultant opinions because she found those opinions more consistent with the totality of the evidence. The ALJ's weighing of the various opinions is supported by substantial evidence.

First, though Dr. Wert identified significant limitations in her Medical Source Statement, her treatment notes regarding Plaintiff from a visit that occurred the previous month indicate that her mood, behavior, and affect were normal. Dr. Wert did not explain these inconsistencies, which contradict the work-related limitations she identified in her September 2016 opinion. Dr. Wert did not explain how these observations supported her Medical Source Statement. The ALJ therefore did not err in discounting Dr. Wert's opinion. *See Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009) (concluding that an

ALJ may discount an opinion that is inconsistent with physician' treatment notes). In addition, Dr. Wert's opinion was inconsistent with observations made by Plaintiff's other treating providers, including Wiggs, Dr. Van Cleve, Leaman, and Dr. Legrand. This further lends support to the ALJ's conclusions that the workplace limitations identified by Dr. Wert were not supported by the record.

Second, non-medical evidence in the record, including Plaintiff's own testimony, is inconsistent with the limitations that Dr. Wert described in her opinion. Dr. Wert indicated that Plaintiff's mental health impairments would interfere with up to 75 percent of her day-to-day functioning, that Plaintiff would require at least four days off a month, and that Plaintiff would be unable to complete a normal workday or workweek. Yet Plaintiff herself testified that she was the primary caregiver for her three grandchildren every day, and that she was responsible for feeding them, preparing them for school, and that she was with them all the time. There is no indication that Dr. Wert considered these circumstances in developing her opinion and, indeed, this evidence weighs strongly against the limitations that Dr. Wert described. In fact, her opinion is largely conclusory and contains little explanation at all as to how she reached her conclusions. *See McDade v. Astrue*, 720 F.3d 994, 1000 (8th Cir. 2013) (noting that controlling weight need not be given to treating physician opinion when opinion is conclusory and physician fails to explain how he or she reached this opinion). It is telling that Plaintiff cites to no evidence in the record that would explain the inconsistency between Dr. Wert's opinion and Plaintiff's responsibilities caring for her grandchildren.

Plaintiff spends substantial time in her brief identifying portions of the record that support her proposed interpretation of Dr. Wert's opinion, including notes where she indicated she had difficulty continuing with her normal day following panic attacks, which often occurred multiple times a week. The fact that Plaintiff is able to identify some evidence in the record that supports her position does not mean the ALJ's decision must be reversed. *Woolf*, 3 F.3d at 1213. Nor does that mean a particular finding is not supported by substantial evidence. *Thiele v. Astrue*, 856 F. Supp. 2d 1034, 1045 (D. Minn. 2012) (citing *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994)). In short, the record shows that the ALJ properly considered and evaluated the testimony of Plaintiff's treating physician and that the ALJ gave good reasons for rejecting that testimony.

Likewise, the ALJ's decision to place substantial weight on the opinions of the state consultants was not erroneous. Typically, such opinions are "entitled to little weight" when evaluating a claimant's disability, particularly when compared to a treating provider's opinion. *Sultan v. Barnhart*, 368 F.3d 857, 863 (8th Cir. 2004). But when "better or more thorough medical evidence" exists, the ALJ may disregard the treating provider's opinion and place greater weight on that offered by the state consultants, so long as the ALJ gives reasons for her assessment and those reasons are supported by substantial evidence. *Smith v. Colvin*, 756 F.3d 621, 626-27 (8th Cir. 2014) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)r). In this case, the ALJ found that the evidence in the record as a whole, including Plaintiff's extensive history of caring for her grandchildren, supported the state consultants' RFC determination and contradicted the treating physician's opinion. The ALJ's finding was also consistent with Plaintiff's mental status exams, most of which

indicated normal behavior and fair judgment. In short, Plaintiff's self-reported abilities are inconsistent with the medical opinions of Dr. Wert. *Toland v. Colvin*, 761 F.3d 931, 936 (8th Cir. 2014). As a result, the ALJ did not err in disregarding the testimony of Dr. Wert.

Finally, Plaintiff contends that, if the ALJ had questions regarding her functional limitations, the ALJ was required to either contact the treating physician for clarification, request a consultative examination or send the case back to the State for evaluation. She contends that instead, the ALJ set her own opinion against the uncontradicted one offered by her treating physician. This is not the case. "It is the function of the ALJ to weigh conflicting evidence and to resolve disagreements among physicians." *Kirby*, 500 F.3d at 709. The ALJ fulfilled her duty to consider the record as a whole and balanced the opinions of the various medical providers and consultants, as well as Plaintiff's work history and responsibilities with her grandchildren. Based on the review of that evidence, the ALJ set forth an RFC that adequately encompassed Plaintiff's limitations. Because the ALJ's findings are supported by substantial evidence in the record, the Court will deny Plaintiff's motion for summary judgment and grant Defendant's motion.

## IV.    CONCLUSION

Based upon the record, memoranda, and proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment, (ECF No. 17), is **DENIED**, Defendant's Motion for Summary Judgment, (ECF No. 21), is **GRANTED**, and this matter is **DISMISSED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Date: March 14, 2019                                    _____*s/ Tony N. Leung*_____
                                                       Tony N. Leung
                                                       United States Magistrate Judge
                                                       District of Minnesota

                                                       *Kimberly S. v. Berryhill*
                                                       Case No. 17-cv-311 (TNL)